UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Select Comfort Corporation<br><br>Plaintiff<br><br>v.<br><br>Sleep Products D2C, Inc.; The Sleep Better Store, LLC; The Merrick Group, LLC; Merrick Group Capital 1, Ltd.; Philip Krim; and Lawrence Krim,<br><br>Defendants. | Court File No.: 13-cv-02621-SRN-JJK<br><br>**DECLARATION OF PHILIP KRIM SUBMITTED IN RESPONSE TO DECLARATION OF CHRISTOPHER PHILLIPS** |

**STATE OF CALIFORNIA** )
)
**COUNTY OF SANTA CLARA** )

I, Philip Krim, hereby make the following declaration pursuant to the provisions of 28 U.S.C. § 1746:

1. I am over the age of eighteen and am a resident of Texas. I am fully competent to testify as to the matters set forth in this declaration, which are true and correct based upon my own personal knowledge.

2. Although Christopher Phillips did not personally have an ownership interest in Sleep Products D2C, Inc., his assertion is misleading. According to the Organizational Written Action of Incorporator, First Board of Directors and Shareholders of Sleep Products D2C, a company named Dalmari, Inc. acquired 2,000,000 shares of Sleep Products D2C's stock, which represented 20% ownership of the company. Dalmari is a Florida corporation that is owned by Christopher Phillips' family, with his mother, Marilyn Phillips, acting as its registered agent. A copy of the Organizational Written Action is attached to this declaration and Exhibit A and a

copy of Dalmari's annual report filed with the Florida Secretary of State is attached to this declaration as Exhibit B.

3. Christopher Phillips was in charge of scheduling the closing for the sale of the Merrick Group, LLC and its related entities and assets to Charles Odom and Sleep Products D2C. He never raised any issues with regards to the transaction being rushed. Attached as Exhibit C are emails showing that Christopher Phillips personally chose the closing date and also drafted all of the documents necessary for the transaction. In fact, although Christopher Phillips originally chose a closing date of July 1, 2013, he later changed the date to July 5, 2013 and the transaction closed on that date.

4. Lawrence Krim and I were completely truthful with Christopher Phillips and Charles Odom about the lawsuit filed by Select Comfort against The Sleep Better Store and about how much money The Merrick Group owed its attorneys. During the course of due diligence performed before the purchase of the Merrick Group and its related entities and assets, Christopher Phillips was provided with details regarding the Merrick Group's liabilities and the substance of the lawsuit filed by Select Comfort. Attached as Exhibit D are emails and related attachments showing that after the purchase was completed, Christopher Phillips was involved in drafting letters to BFS and Google to renegotiate the debts owed to those companies by the Merrick Group. I never told Christopher Phillips that the Merrick Group should not go through bankruptcy—it was his decision to make. He told me that he had spoken with a bankruptcy attorney and that it was unnecessary for The Merrick Group to go through the bankruptcy process.

5. I am not a shareholder of Sleep Products D2C. Even though under the Membership Units Purchase Agreement and the Organizational Written Action Lawrence Krim

91329.v2

and I were each supposed to receive 500,000 shares of SleepProductsD2C stock, (representing 5% of the company, respectively), we were never actually issued any stock. A copy of the Membership Units Purchase Agreement is attached to this declaration as Exhibit E.

6. Christopher Phillips fails to mention that both Charles Odom and Sleep Products D2C purchased the Merrick Group and all its related entities and assets. *See* Exhibit E, at 1.

7. Christopher Phillips' assertion that Sleep Products D2C "never received any revenue or profits from the sales of The Merrick Group products" is patently false. As owner of the Merrick Group and its related entities and assets, Sleep Products D2C received 100% of the gross revenue from the sale of The Merrick Group Products. And all financial activity for Sleep Products D2C continued to occur through The Merrick Group's bank account at Wells Fargo because Christopher Phillips directed that it should do so. Rather than open a new banking account for Sleep Products D2C, Christopher Phillips directed Lawrence Krim and I to give him access to the Merrick Group's existing accounts. Attached as Exhibit F are emails showing that Christopher Phillips wanted to continue using The Merrick Group's existing accounts with Wells Fargo for Sleep Products D2C's financial needs. The emails also show that all that was required for Christopher Phillips to have signature authority on the account was for him to set up a profile with the bank, which he never accomplished. Christopher Phillips also received daily cash reports containing the previous day's sale of Merrick Group Products from Gracie Salgado, the company's bookkeeper. Christopher Phillips reviewed the reports and approved any expenditures or use of company funds detailed in the reports. Attached as Exhibit G are emails showing Christopher Phillips' receipt of these daily reports and demonstrating his authority to approve the wiring of company funds.

91329.v2

8. After the purchase by Sleep Products D2C, Christopher Phillips directed Lawrence Krim to continue to use the existing Merrick Group payment systems that were in place at the time of sale to handle employee compensation. But, contrary to Christopher Phillip's assertion, the Krims did not receive 401(k) payments after the purchase of the Merrick Group and its related entities and assets by Sleep Products D2C.

9. I was not paid as an employee by Sleep Products D2C. Attached as Exhibit H are emails showing that I worked as a monthly consultant and independent contractor for Sleep Products D2C and was paid as such.

10. Christopher Phillip's assertion that I asked Sleep Products D2C to pay off my business and personal credit cards is misleading because he fails to mention that the Membership Units Purchase Agreement specifically required Sleep Products D2C to indemnify me with regard to any and all business debt of the company that I had personally guaranteed. *See* Exhibit E, at 2, ¶ 1(b)(vii). Sleep Products D2C also agreed to "loan money under working capital facility to Krim's to pay off personal liabilities of personally related expenses on corporate books or on Company's credit cards." *See id.* at 2, ¶ 1(b)(v). Attached as Exhibit I is an email and related attachment showing that Christopher Phillips was aware of Sleep Products D2C's obligation to pay off the personal debt.

11. Sleep Products D2C, which owned The Merrick Group, was supposed to pay interest to Charles Odom on his loans to the company. These interest payments never took place because the company did not make enough money to continue operating.

12. Christopher Phillips never told me that he had found an alternative website design firm for the company to use instead of Artifex ███████████████████████. In fact, he asked me to price out different website design firms, besides Artifex, for the

website redesign. I did so and reported the results back to him. All of the other design firms were more expensive than Artifex ███████████████████████████████ ████████ ██████████████████████████ and were the cheapest option, in part because they knew the system and were familiar with the content because they had designed the existing websites. Christopher Phillips told me to move forward with Artifex.

13.     Christopher Phillips' assertion that Lawrence Krim and I had "complete authority and responsibility to ensure compliance ████████████████████████████ ' is false. Lawrence Krim and I worked under Christopher Phillip's direction to achieve compliance ████ ██████████████████████ As CEO, Christopher Phillips had final authority for website and advertising content. Attached as Exhibit J are emails showing Christopher Phillips giving the final authority for website design and advertising content, including whether or not certain websites should go live. ████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████

14.     ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Christopher Phillips made the decision on when to activate the new website. ████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

15. ████████████████████████████████████████ As CEO of Sleep Products D2C, Christopher Phillips had complete control of the company's website and it stayed live under his orders.

16. As far as I know, Sleep Products D2C is insolvent.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct to the best of my knowledge.

Dated: 12-13-13

_Philip Krim_

91329.v2